AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**

**SEALED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

DEC 14 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
By _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Amerika Mobley | ) | 2:18 - MJ - 0256   AC |
| Benjamin Gilbert | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or about ___March 7, 2016, and continuing through December 8, 2018___ in the counties of ___Calaveras, Placer, Amador, El Dorado, and elsewhere___ in the ___Eastern___ District of ___California___, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) | Distribution and conspiracy to distribute and possess with intent to distribute at least 10 grams of a mixture and substance containing a detectable amount of Lysergic Acid Diethylamide (LSD) and a mixture and substance containing a detectable amount of 3 4 Methylenedioxymethamphetamine (MDMA) |

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

_____
*Complainant's signature*

Brian Nehring, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___12/13/18___

_____
*Judge's signature*

City and state: _____

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT, CRIMINAL COMPLAINT, AND ARREST WARRANTS

I, Special Agent Brian Nehring of the DEA, being duly sworn, depose and state as follows:

### Background and Expertise

1. I am a Special Agent of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been so employed since 1991. I have had numerous assignments since beginning with DEA, including being assigned to the Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team (MET) between 2002 and 2004. I have been assigned to the Sacramento Division Office since September of 2004.

2. I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal, from the Drug Enforcement Administration (DEA). In addition, I graduated from the DEA Basic Agents Academy at the FBI Academy at Quantico, Virginia. In total, I have received in excess of 500 hours of comprehensive formalized classroom instruction in those areas outlined above.

3. I have assisted in the execution of more than four hundred (400) warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics statutes. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the traffickers' effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain. I have been actively involved as case agent in excess of two hundred (200) investigations and have talked with confidential informants involved in the trafficking of narcotics, and this has formed the basis of my opinions.

4. I have been qualified as and have testified as an expert witness in both federal and state court in the Northern and Eastern Districts of California and in counties including Alameda, Contra Costa, Solano, Sacramento and others. These areas of qualification have included possession for sale, possession with intent to distribute, manufacturing of a controlled substance and cultivation.

## Scope of Requested Criminal Complaint and Search Warrant

5.  This Affidavit is submitted in support of a Criminal Complaint and Arrest Warrants charging **Amerika MOBLEY** and **Benjamin GILBERT** with distribution and conspiracy to distribute and possess with intent to distribute at least 10 grams of a mixture and substance containing a detectable amount of Lysergic Acid Diethylamide (LSD) and 3 4 Methylenedioxymethamphetamine (MDMA) in violation of 21 U.S.C. §§ 846 and 841(a)(1).

6.  This Affidavit is also submitted in support of a search warrant to search the following locations:

    A.  The current residence of GILBERT and MOBLEY located at **2366 Tahoe Vista Drive, South Lake Tahoe, California;**

    B.  The person of **Benjamin GILBERT**

    C.  The person of **Amerika MOBLEY**; and

    D.  All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.

7.  I believe that MOBLEY and GILBERT are large-scale LSD, MDMA, cocaine, and marijuana traffickers working together and currently operating within the Eastern District of California. Based upon the ongoing federal investigation detailed below, I believe that MOBLEY and GILBERT have been distributing large amounts of LSD, MDMA, cocaine, and marijuana in the Eastern District of California, as well as throughout other states including New York, from 2015 through 2018. GILBERT and MOBLEY supplied me with over 10 grams of LSD and amounts of MDMA and Cocaine during this period. I believe that MOBLEY and GILBERT are currently living at their residence at 2366 Tahoe Vista Drive, South Lake Tahoe, California, and that they have consistently used vehicles registered in their names to transport and deliver their drugs. This Affidavit therefore also requests authority to search the locations described in Attachment A in order to located and seize the items described in Attachment B as evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 – conspiracy to distribute, distribution, and possession with intent to distribute LSD, MDMA, Cocaine and Marijuana.

## Background of Investigation

### 2014-2015 initial investigation identifying Amerika MOBLEY as large-scale LSD, MDMA, cocaine, and marijuana source of supply for seized drugs

8. Beginning in 2014, I conducted an investigation of two drug traffickers working in concert in the Sacramento, California area who were involved in the sale and distribution of large amounts of MDMA and LSD. I subsequently met them together in an undercover capacity beginning in June 2014 and began purchasing powder MDMA and liquid LSD from them. Between 2014 and August 2015, I purchased approximately 4,500 dosage units of LSD in liquid suspension and over a pound of MDMA from these two individuals in Sacramento County.

9. In September 2015, I arranged for these two individuals to deliver approximately 1500 dosage units of LSD in a liquid suspension and a half-kilogram of powder MDMA in Sacramento in exchange for an agreed price of approximately $27,000.00. Upon delivery, these two individuals were arrested. Shortly after their arrest, a federal search warrant was executed at their nearby residence. At this location, agents located and seized an additional half-kilogram of powder MDMA, approximately a kilogram of cocaine, another apparent 10,000 dosage units of LSD in a liquid suspension, a crystalline gram of pure LSD which I know from my training and experience to be the equivalent of 10,000 dosage units once converted to liquid suspension or other carrier medium, additional amounts of other drugs to include psilocybin mushrooms, DMT, 2C-B, Oxycodone, and approximately $125,000.00.

10. I spoke to both of these individuals, both separate and apart, following their arrests. They acknowledged and waived their *Miranda* rights and agreed to speak with me. These individuals related that beginning in approximately 2012, they met an individual known to them as Leekah, subsequently identified from a Department of Motor Vehicles (DMV) photograph as **Amerika MOBLEY**, in the San Francisco Bay Area. At this time MOBLEY was the kilogram MDMA source of supply to their mutual acquaintance and they began obtaining a kilogram of powder MDMA at a time from MOBLEY for prices between $21,000.00 and $28,000.00. Per these individuals, they and other persons would pool their money to give to MOBLEY, who would return with multiple kilograms of powder MDMA. These individuals related that they did not know where MOBLEY actually lived but at various times he claimed to live in San Francisco, Santa Rosa and most recently in the Grass Valley and Nevada City, California area.

11. These individuals related that eventually MOBLEY began supplying them with grams of LSD for approximately $29,000.00 per gram and that it sometimes came in liquid form or in crystalline form. They related that the last time they had dealt with MOBLEY was approximately two months prior to their arrest at which time they purchased two grams of LSD and a kilogram of MDMA from him, which included the LSD and MDMA they had attempted to deliver to me that day and the remaining amount that had been recovered from their residence. They also indicated that

3

MOBLEY had provided them with kilogram quantities of cocaine in the past but that the cocaine recovered from their residence had been supplied by another individual.

12. These individuals related that approximately two or three days prior to their arrests, they had received a call from MOBLEY who had stated that there was a new batch of MDMA available if they were interested. The previous evening, around 10:00 p.m., one of these individuals received a call from MOBLEY who stated they could meet the following evening in the Bay Area for them to give him the money for the kilogram of MDMA, which he indicated was cheaper than usual at $23,000.00. MOBLEY indicated he would call that afternoon to confirm and to pick a location and time to meet.

13. Both individuals stated that MOBLEY would be expecting a cellphone call that afternoon; otherwise, he would become suspicious that something was not right, or he would become angry they had blown him off. Therefore, they agreed to place a recorded telephone call to MOBLEY to explain why they could not meet. One of these individuals placed a monitored and recorded telephone call in my presence to MOBLEY. During this call, the one individual told MOBLEY that they would not be able to meet because the other individual had crashed their car, wrecked it completely, and was in the hospital. MOBLEY asked if this person wanted to meet later, and the individual indicated he/she would call MOBLEY once they figured out what was going on. This individual also asked MOBLEY if there was any LSD ("L") available, and MOBLEY indicated there was and it was better than the last stuff he had provided.

14. In late 2017, both these individuals testified in front of a federal grand jury in Sacramento as to the facts surrounding their arrests and their relationship obtaining LSD, MDMA, Cocaine, and Marijuana from MOBLEY and identified him as their source of supply. As of this time, they have not yet received any consideration as to their pending case.

15. Inquiries with the National Criminal Information Center (NCIC) revealed that MOBLEY had a criminal history including, but not limited to, arrests for Possession of a Controlled Substance, Vandalism and Possession of Marijuana, and other misdemeanor crimes.

**Benjamin GILBERT 2016 LSD UC purchases and links to Amerika MOBLEY**

16. In 2015 and 2016, I spoke with a Confidential Source, hereinafter referred to as the CS, regarding the ongoing LSD trafficking activities of multiple individuals in the South Lake Tahoe, California area.

17. At this time, the CS was providing me with information solely in hopes of receiving financial compensation. The CS has a criminal history mostly confined to DUI offenses and has no felony convictions. The CS has provided me with assistance in the past including but not limited to providing intelligence, making controlled

4

purchases of narcotics, and introducing undercover agents to purchase narcotics. The CS's information has previously been used in state and federal search warrant affidavits leading to the seizure of large quantities of narcotics and the successful prosecution of individuals for federal narcotics offenses. I have never found the CS to be false or misleading, and the CS's descriptions of drugs and drug dealing have been entirely consistent with my own training and experience in this area. For these reasons, I consider the CS reliable.

18. The CS related that he/she had several individuals in the South Lake Tahoe area in the last couple of years who claimed to be large LSD, MDMA, Cocaine, and Marijuana traffickers. Two of these individuals were known to the CS as "Benja," subsequently identified as **Benjamin GILBERT**, and GILBERT's friend, hereinafter referred to as "X" for the purposes of this affidavit as I am not currently requesting an arrest warrant for this individual and do not wish to place this individual at any undue risk. The CS met both individuals in South Lake Tahoe in approximately 2015. GILBERT represented himself as a musician "DJ" and X represented himself as a professional skier. They both claimed to have moved to the Tahoe area from out of state and to have been living in the Tahoe area for several years. GILBERT and X also informed the CS that they were was heavily involved in trafficking in LSD, MDMA, Cocaine, and Marijuana, which they sold in the Tahoe area in addition to transporting to other states for distribution.

19. The CS related that during 2015 and 2016, GILBERT used the same cellular telephone number, **801-867-5210**. Inquiries with Verizon cellular telephone company revealed that this number was subscribed in the name of Benjamin GILBERT. The CS related that GILBERT had claimed at specific times to be using this telephone to contact his source of supply for LSD who he claimed lived in the Grass Valley/Nevada City area.

20. The two individuals discussed above identified the phone number 707-326-3871 as being used by MOBLEY in 2015. This was the number to which they made the recorded call to MOBLEY to discuss the possibility of obtaining additional MDMA and LSD. Intelligence Analyst Matthew Kregor subsequently examined the tolls for this no-name prepaid telephone and observed that during late 2015 and early 2016, this telephone number was in high frequency contact with GILBERT's subscribed telephone throughout this time and during times when GILBERT had claimed he was contacting his LSD source in the Grass Valley/Nevada City area. DMV inquiries for MOBLEY revealed that MOBLEY had, as of 2014, began providing a residential address of 10699 Spenceville Road, Penn Valley, California. I noted that Penn Valley is adjacent to Grass Valley in rural Nevada County. For these reasons, I formed the belief that GILBERT was most likely obtaining MDMA and LSD from MOBLEY and that he was using his telephone to communicate with MOBLEY for that purpose.

21. I subsequently learned through open source inquiries that GILBERT had been listing a residential address of 3704 Primrose Road, South Lake Tahoe, California in recent

5

years.  Other agents and I traveled to this residence on subsequent occasions and observed a **black 2003 Nissan Pathfinder** registered in GILBERT's name in Nevada parked at this location.

22. Beginning in January 2016, I telephonically contacted GILBERT at his identified telephone and represented myself as an individual who was a mutual friend of one of his acquaintances and who wished to obtain LSD from him.  I subsequently arranged through recorded calls and text messages to meet GILBERT on January 29, 2016, in the parking lot of a Safeway Store in Placerville, California to purchase approximately five vials of liquid LSD (each vial the equivalent of 100 dosage units) for an agreed price of $2,000.00.  An example of some of the text messages I received from GILBERT leading up to this transaction is the following: `Hey buddy! Just wanted to keep you informed? We just got back to my house… We're honestly not gunna get out of her till 1130…Just wanted to let you know!` GILBERT indicated he was traveling from his residence in South Lake Tahoe and he subsequently arrived in the same black Nissan Pathfinder and delivered the suspected LSD (54 gross grams – gg) to me at this location. GILBERT related that he was a DJ and that he traveled quite a bit and that he also had powder MDMA available for sale at $1100 per ounce, which he said was cheap.  GILBERT related that the LSD he was delivering to me came from his main source of supply who converted gram quantities of "fluff" crystalline LSD into vials of liquid LSD of very high quality.  Subsequent analysis by the DEA Western Regional Laboratory revealed that this substance GILBERT sold was **12.529 grams of Lysergic Acid Diethylamide (LSD)**.

23. On March 7, 2016, I again arranged during recorded calls and text messages to GILBERT to deliver ten vials of liquid LSD from him for the agreed price of $4000.00.  During the calls leading up to this transaction GILBERT related that his LSD source was in the process of generating a large number of vials and that he had visited his friend who lived on a rural property just outside of Grass Valley.  An example of one of the text messages I received from GILBERT leading up to this transaction is the following: `Just called!! Got that number for you.` GILBERT again indicated he was traveling from South Lake Tahoe and he again arrived in Placerville driving the same black Nissan Pathfinder.  GILBERT met me in a K-Mart parking lot and delivered the LSD (77 gg).  During the subsequent conversation related to me that he was operating marijuana grows throughout Northern California and was shipping large amounts of marijuana out of state.  Subsequent analysis by the DEA Western Regional Laboratory revealed that this substance GILBERT sold was **20.47 grams of Lysergic Acid Diethylamide (LSD)**.

24. During this time, IA Kregor noted that the previously-identified 707-area code pre-paid cellular telephone used by MOBLEY had been de-activated. IA Kregor identified a new cellphone believed to be used by MOBLEY, **530-446-4483**, which was a Verizon cellphone initiated on April 9, 2016 and subscribed to Amerika MOBLEY at 10699 Spenceville Road, Penn Valley, California. IA Kregor analyzed the tolls for this phone and noted that its calling pattern matched that of the

previously-identified phone, and that soon after being initiated it began having regular contact, both calls and texts, with the identified telephone subscribed to GILBERT, which I was contacting during this same period to arrange these LSD transactions.

25. In May and June 2016, I engaged in further recorded narcotics-related text messages and calls with GILBERT, during which I arranged to purchase approximately 1000 dosage units of liquid LSD in suspension and a half-ounce of powder MDMA as a sample for a total price of $4,200.00. An example of one of the text messages I received from GILBERT leading up to this transaction is the following: `I'll call u tomorrow! Everything is good! I'll call u around noon.`

26. On June 30, 2016, GILBERT met me at an In-N-Out Burger in Placerville and delivered 108 gg of LSD to me. GILBERT related that his source for LSD had "grams and grams for days" and that he broke down crystalline LSD. GILBERT indicated this person also had as much MDMA as GILBERT could want but the price would not go down on the MDMA. GILBERT also discussed shipping drugs to his customers in New York. I agreed to contact GILBERT again in the future. Subsequent analysis by the DEA Western Regional Laboratory revealed that this substances GILBERT sold were **14.593 grams of Lysergic Acid Diethylamide (LSD)** and **12.967 grams of 3.4-Methylenedioxymethamphetmamine (MDMA)**.

27. IA Kregor subsequently noted that the Verizon phone with number **530-446-4483** which was subscribed to MOBLEY and which was in contact with GILBERT during this period ceased to be used in approximately August 2016. IA Kregor leaned that a new cellular Verizon Cellular telephone subscribed in MOBLEY's name and subscribed to MOBLEY's Penn Valley, California address was initiated on August 28, 2016.

28. In October 2016, the CS related that he/she had been informed by some mutual friends of GILBERT that the source of supply for LSD, MDMA, Cocaine, and Marijuana to GILBERT was a Black Male adult known as "Leekah" who resided in Nevada County and who was originally from the San Francisco Bay Area, specifically, Oakland, California.

### 2017 LSD UC purchases from "X" and links to MOBLEY

29. In early 2017, I spoke to the same CS. He/she had run into X after not having seen him for over a year. X had at that time told the CS that he had recently been placed in direct contact with an LSD source of supply and that this person was obtaining and distributing gram quantities of crystalline LSD. X related that he was currently obtaining approximately 30 vials of liquid LSD at a time from this source (equating to approximately 3000 dosage units, as each "vial" usually contains 100 dosage units) and could obtain grams of crystalline LSD if he had the money.

30. In March 2017, the CS arranged at my direction to purchase eight vials of liquid LSD from X for approximately $300 per vial. X indicated on that particular day that he was working at his job at a ski resort and he requested to meet in the parking lot of that business. I transported the CS to that location in my vehicle. X subsequently came out to my vehicle and the CS introduced me to X. At this time I purchased the eight vials of suspected liquid LSD (71 gross grams) from X in exchange for $2400.00 OAF. I told X I would contact him in the future to purchase additional LSD. Following this transaction, X was observed by Task Force Officer (TFO) James Applegate to walk from my vehicle to his nearby vehicle. After accessing this vehicle, he was observed to return on foot to the ski resort complex. Subsequent analysis by the DEA Western Regional Laboratory revealed that this substance X sold was **21.953 grams of Lysergic Acid Diethylamide (LSD)**.

31. In April 2017, I telephonically contacted X and arranged to purchase 1000 dosage units of LSD from him in Auburn, California at a public business parking lot. X arrived as a passenger in a vehicle which was driven by a female adult whom he indicated was his friend who was giving him a ride to the San Francisco Bay Area. X entered my vehicle and produced a bag containing a foil-wrapped rectangle comprised of 1000 blotter paper dosage units bearing the images of Angels (85.8 gross grams). I paid X $2800 OAF for this LSD. X related to me that he normally obtained only vials of liquid LSD but this LSD on blotter paper was of good quality and was from a separate source than his normal source so he had obtained quite a bit to assess the quality. I again agreed to purchase additional LSD in the future. Subsequent analysis by the DEA Western Regional Laboratory revealed that this substance X sold was **8.4 grams of Lysergic Acid Diethylamide (LSD).**

32. In May and June 2017, I engaged in recorded calls and text messages with X at a particular cellular telephone arranging to purchase a similar amount of LSD (approximately 1000 dosage units), which he indicated would definitely be in liquid form as I had requested. An example of some of the text messages I received from X leading up to this transaction is the following: **Paasing squaw; Get a water cup from them and jist get ice; keep em chill.**

33. On June 6, 2017, I agreed to meet X at a public business parking lot in Truckee, California to purchase the LSD. X subsequently arrived in a vehicle later found to be registered in his name. X entered my vehicle and sold me approximately 1000 dosage units of liquid LSD in nine separate Visine eye drops vials (150.9 gross grams) for $2900 OAF. X indicated to me that one of the vials was clearly marked and was a "double" vial containing 200 dosage units. X told me that he had left his nearby residence early that morning and had traveled to meet his source of supply in South Lake Tahoe that day. X related that while at that location he had assisted this individual in converting the crystalline LSD into liquid vials, including the LSD vials he had just delivered to me. X indicated that there would be additional LSD available in following week. Following this transaction, X exited my vehicle and returned to his vehicle and drove out of the lot. Subsequent analysis by the DEA Western

8

Regional Laboratory revealed that this substance X sold was **43.9 grams of Lysergic Acid Diethylamide (LSD)**.

34. IA Kregor subsequently noted that on the days I spoke to X leading up to this transaction, X's identified telephone had high frequency telephonic contact with the identified telephone subscribed to MOBLEY. The first time I was contacted by X following the April 2017 transaction was on May 23, 2017 at approximately 8:58 p.m. when X sent me a text message asking me what was up. Toll records showed that X had engaged in a two minute call with MOBLEY's telephone moments before sending me this text message. IA Kregor noted that X continued to have contact with MOBLEY's telephone immediately before and after calls with me leading up to June 6, 2017. On this date (June 6, 2017) X's and MOBLEY's telephones engaged in 15 calls, including apparent no-duration text messages, during the approximate times X indicated he had traveled to South Lake Tahoe to meet his LSD source to obtain the LSD. IA Kregor noted that after June 6, 2017, X's and MOBLEY's telephones had no contact until July 29, 2017 at 3:24 p.m. at which time they engaged in a text message. X had obtained a new cellular telephone in July 2017. I had no contact with X following the June 6, 2017 LSD transaction until July 29, 2017 at approximately 3:25 p.m., when I received a text message from him from this new number asking for a call back to discuss upcoming transactions within one minute of the text message with MOBLEY's telephone. I believe this text message exchange between X and MOBLEY within seconds of X contacting me after not having communicated with me for over six weeks was X and MOBLEY engaging in LSD-related text communication.

35. In July 2017, the Honorable Magistrate Judge Allison Claire authorized the installation of a GPS tracking device on X's vehicle. In August 2017, agents traveled to X's residence and were able to locate the vehicle and installed the GPS tracker covertly.

36. In August 2017, I engaged in recorded narcotics related calls and text messages with X, during which I arranged to purchase a large amount of LSD from him. Specifically, on August 6, 2017, at approximately 7:15 p.m., I telephonically contacted X and inquired about purchasing more LSD. X related that he would call his source of supply immediately and that it would be the same LSD from the same source that had supplied the LSD in June 2017. X stated several times he would call the source immediately.

37. Toll analysis showed that immediately after this conversation, at approximately 7:20 p.m., X's cellphone sent three successive text messages to MOBLEY's identified cellphone, as well as multiple text messages the following day. On August 8, 2017, at approximately 7:23 p.m., I again telephonically contacted X and stated I was prepared to meet him in the next day or so. X related that he would immediately contact his source of supply to find out how much LSD he had left. Toll analysis showed that immediately following this call and beginning at 7:28 p.m. and through

9

8:38 p.m., X's and MOBLEY's telephones engaged in approximately 15 text messages back and forth.

38. On the morning of August 9, 2017, I again telephonically contacted X after receiving a call from him. X stated that he had just gotten word from his source of supply and that X was going to obtain the exact same LSD from the exact same source ("It's 100 percent the same thing, it's the same guy") that day and we could meet the following day. Toll analysis showed that on August 9, 2017, just prior to calling me, X had received three text messages from MOBLEY's telephone and then engaged in approximately 23 calls and text messages with MOBLEY's telephone the remainder of the day through approximately 8:55 p.m.

39. On August 10, 2017, in the evening, X attempted to call me and sent me text messages. The following is an example of some of the text messages I received from X during this period: **I was up since eight trying to get a new phone; IGot you all those last night I will drive down please call me**. X subsequently called me and related to me that he had broken his phone that morning and had spent the better part of the day traveling to Reno, Nevada to obtain a new phone. X indicated to me that he had obtained the LSD from his source of supply late the previous evening and that he had the LSD and was prepared to meet me the following morning to deliver the LSD. I agreed.

40. SA Max Lashchuk checked the GPS data from the court authorized GPS tracker which was installed on X's vehicle, and observed that on the evening of August 9, 2017, X's vehicle traveled from his Placer County residence to Ruby Way, South Lake Tahoe, California where he arrived at approximately 9:05 p.m., approximately ten minutes following the last contact with MOBLEY's telephone at 8:55 p.m., and stayed there until approximately 9:33 p.m. before returning directly back to Kings Beach.

41. Prior to this time, IA Kregor learned that one of the highest-frequently contacted cellphone numbers by MOBLEY's telephone was a cellphone used by Kendra BLUM, MOBLEY's suspected girlfriend who had previously listed the same Penn Valley, California address with him (which is the same address his phone was subscribed to) and who per analysis of Facebook accounts apparently lived with MOBLEY. Inquiries with DMV revealed that BLUM had recently registered a vehicle and supplied a residential address of 3720 Ruby Way, #A, South Lake Tahoe, California. Inquiries with Liberty Utilities revealed that services had been initiated at this location in BLUM's name in 2017.

42. On the morning of August 10, 2017, SA Lashchuk traveled to 3720 Ruby Way #A, South Lake Tahoe, California. At this residence (a separate residence with a garage located on the left side of a duplex) SA Lashchuk observed and photographed a red 2003 Ford F150 truck, California license plate #**39391G1**, parked in the driveway. DMV records showed this vehicle was registered in the name of Amerika MOBLEY at 10699 Spenceville Road, Penn Valley, California. I believe based upon X's

10

statements regarding calling and traveling to obtain the LSD from his source of supply on August 9, 2017, the toll records showing immediate calls and texts back and forth with MOBLEY's subscribed telephone, the GPS information for X's vehicle showing it traveling to this location on the evening when he indicated he had traveled to meet his source late that evening to obtain the LSD, and MOBLEY's vehicle being observed at this location the following morning, that MOBLEY supplied the LSD to X, most likely at this location.

43. I agreed to meet X at on August 11, 2017 at a public location in Rocklin, California. The GPS tracker on his vehicle showed vehicle leaving X's residence that morning and traveling directly to the agreed public location in Rocklin where I observed X's vehicle. X entered my vehicle and sold me approximately 1700 dosage units of liquid LSD in 17 separate eye drops vials (153 gross grams) for $4900 OAF. X and I discussed the quality of the LSD and future transactions. Subsequent analysis by the DEA Western Regional Laboratory revealed that this substance X sold was **31.9 grams of Lysergic Acid Diethylamide (LSD).**

44. After August 11, 2017, I had no contact with X until September 15, 2017, at approximately 4:00 p.m., when he sent me a text message identifying himself and his new telephone number and asking when I might want to meet again. Subsequent toll analysis showed that X was using a new Verizon telephone. Toll analysis showed that at on September 15, 2017, at approximately 4:02 p.m., within two minutes of contacting me, X's telephone called MOBLEY twice and apparently engaged in a conversation.

45. In late September, I engaged in recorded calls and texts with X discussing a possible future LSD transaction. Toll analysis showed that during and around these times, X's telephone was in contact (including text messages) with MOBLEY's telephone. I did not speak to X again till late October 2017.

46. Between October 30 and early November 2017, I engaged in several recorded narcotics related telephone calls with X discussing the possibility of an LSD transaction for over 2000 dosage units. During these calls, X indicated that his source of supply was planning on traveling to obtain multiple gram quantities of crystalline LSD. X encouraged me to consider obtaining up to a gram of LSD at a time, which would equate to at least 10,000 dosage units. I noted that toll analysis of X's telephone showed that on October 30 and November 1, 2017, in and around the times I spoke to X, X's telephone was in contact with MOBLEY's telephone, including text messaging.

## 2018 MOBLEY and GILBERT continue to engage in narcotics trafficking and are living together at 2366 Tahoe Vista Drive, South Lake Tahoe, California

47. In January 2018, I spoke with the original CS. This individual related that he/she had spoken to GILBERT recently and had been invited to GILBERT's new residence at **2366 Tahoe Vista Drive, South Lake Tahoe, California**. While at this residence,

11

GILBERT introduced the CS to an individual who had apparent complete access to the residence as well and who GILBERT referred to as "Leekah." The CS identified this individual from a DMV photograph as MOBLEY.

48. GILBERT told the CS that he and MOBLEY had been operating a profitable "wax" THC extraction business and that they were buying as much bulk marijuana refuse material as possible in order to manufacture this product. They were letting everyone know they would pay a finders-fee for any referrals to marijuana growers who had bulk refuse. GILBERT related that he and MOBLEY had acquired a large rural property in Calaveras County to operate the largest portion of their Butane Honey Oil (BHO) extraction operation. GILBERT told the CS that they had been able to locate a consistent source of "palates full of butane," the solvent used to extract THC from marijuana plant material, and that they could "blow more wax" than any of their competitors. GILBERT told the CS that obtaining this location had allowed them to expand and manufacture much more extract than when he and MOBLEY were just using their South Lake Tahoe residence.

49. In February 2018, I was contacted by HSI Special Agent Harry Ubele of the Philadelphia Regional Office of the Department of Homeland Security. SA Ubele related to me that on February 13, 2018, SA Ubele and other HSI agents contacted GILBERT and MOBLEY at the Philadelphia International Airport as part of a bulk cash courier investigation unrelated to this case. GILBERT and MOBLEY spoke to agents and admitted that they had been traveling together and had been in New York and Philadelphia and were on their way back to their residences in South Lake Tahoe. Both individuals initially denied possessing any large amounts of US Currency. However, during a subsequent check of their luggage, agents located what they believed (without counting) was approximately $10,000.00 in a sock in MOBLEY's luggage and approximately $9000.00 in a sock in GILBERT's luggage. Both individuals voluntarily gave contradicting statements. GILBERT initially stated they had come to Philadelphia to see a parade and then that he had come to the East Coast to purchase Valentine's Day presents for his girlfriend. The US Currency was subsequently seized and neither individual was willing to provide an address to which to send forfeiture notice. They were then allowed to continue on with their flight.

50. I spoke with the CS again in mid-2018. The CS related that GILBERT had informed the CS that he and MOBLEY were using a private truck shipping company to transport drugs to the East Coast. GILBERT related that he was still distributing large amounts of cocaine and LSD. The CS informed GILBERT that I had been obtaining LSD from X during 2017 instead of GILBERT. The CS told GILBERT that when I had realized that X was obtaining the LSD from MOBLEY and that GILBERT and MOBLEY were partners, I told the CS to tell GILBERT I was going to contact him again and get the LSD from GILBERT as I had in 2016 instead of going through X as I had in 2017. GILBERT indicated that this was wise, that I should call him again, and that he obtained better quality LSD from MOBLEY than X had been because MOBLEY did not adulterate the LSD when he gave it to GILBERT.

51. IA Kregor analyzed the respective Verizon telephones for MOBLEY, GILBERT, and
X for January 2018. IA Kregor noted that after November 2017, X's telephone began
contacting GILBERT (including text messaging) but had little contact with
MOBLEY's telephone. Despite this, GILBERT's and MOBLEY's telephones have
high-frequency nearly daily contact and engage in frequent text messaging. Analysis
showed that GILBERT's and MOBLEY's telephones also had numerous contacts,
including text messaging, with numerous out-of-state numbers, including locations
GILBERT has stated he was shipping cocaine, LSD, MDMA, and marijuana.

52. I noted that during surveillance conducted of 2366 Tahoe Vista Drive, South Lake
Tahoe, California through September 2018, agents routinely observed vehicles
registered in the name of GILBERT and MOBLEY per DMV records parked in
driveway of the residence together or directly in front of the residence. I noted that
one of these vehicles was the original red 2003 Ford Truck, California license plate
39391G1 registered in MOBLEY's name which had been observed parked at the
residence where X went in August of 2017 when he claimed he had traveled to South
Lake Tahoe to obtain the LSD he sold me. Agents also observed a red Ford Ranger at
this same location which had also been observed in 2017 at Ruby Avenue in 2017
when X had traveled to that location to obtain the LSD previously. Based on this, I
formed the belief that GILBERT and MOBLEY had moved in together at 2366 Tahoe
Vista Drive, South Lake Tahoe, California.

### September 2018 purchases of MDMA and cocaine from GILBERT and MOBLEY and arrangement for purchase of large amount of LSD in December 2018

53. In late 2018, I telephonically contacted GILBERT at his original telephone number.
During recorded calls, GILBERT shared with me that he and his roommate were
involved in a large interstate marijuana shipping endeavor and were also heavily
involved in manufacturing BHO/wax products. GILBERT related that they had
invested in specialized equipment including electric presses in order to conduct this
manufacturing. GILBERT also related that despite this, they were still involved in
the distribution of LSD, MDMA, and Cocaine and he would be happy to re-initiate
supplying me with any or all of these substances.

54. In September 2018, I arranged during recorded calls to purchase a large amount of
LSD from GILBERT that month. GILBERT related to me that he was obtaining large
amounts of Cocaine and MDMA at a time from a source of supply in Southern
California. He said that he was getting "whole things," which I understood to mean
kilogram amounts. GILBERT also related to me that his roommate had the source of
supply for LSD. GILBERT told me that they only dealt in the best quality products
but that they only liked doing things that were worth there time. I discussed obtaining
between 15 and 20 vials of LSD from GILBERT. He indicated that this would be
fine but that he hoped in the future it would be larger amounts as they only liked
dealing in bulk. GILBERT informed me that most of their money was wrapped up in

their marijuana/BHO business and asked me if I would be willing to "throw in" with them for the LSD and to travel with them with the cash to go get it when his roommate went to go get the LSD. I told GILBERT I was unable to do so as it was not my money. GILBERT indicated he understood and that normally it would not be a problem and that once they received payment for their marijuana/BHO investment they would cover the money to get the LSD themselves.

55. GILBERT informed me that they currently had a large amount of MDMA and cocaine as well. I arranged to purchase approximately a quarter pound of MDMA and a half ounce of cocaine as a sample from them on September 26, 2018 in Placerville, California. GILBERT related that he and his roommate had to travel to their Calaveras County property in furtherance of their marijuana/BHO operation. That day, I observed GILBERT arrive in a white Subaru Forester (later found to be registered in his name in the State of Nevada) which he was driving and in which I clearly observed MOBLEY as the passenger in the front seat. GILBERT got into my vehicle and sold me **139gg of suspected MDMA and 60gg of suspected Cocaine** in exchange for $4550. GILBERT related to me that if I was willing to purchase at least 50 vials of LSD at a time in the future they would drop the price to $250 per vial, as they were buying in bulk. GILBERT also told me that he and his partner were aware that I had gone through X to obtain LSD in 2017, and that I could come directly to them in the future and it would be better quality. After this transaction, GILBERT and MOBLEY were followed directly to a rural location in Calaveras County where surveillance was discontinued. I performed a presumptive field test on the suspected cocaine which tested positive for the presence of cocaine.

56. I was contacted by GILBERT in late November and early December 2018. During recorded calls, GILBERT informed me that his roommate was his LSD source and that if I was interested in obtaining large amounts, 50 vials and up, it would not be a problem. On December 8, 2018, I spoke with GILBERT and related I was prepared to obtain at least 50 vials within a week. He then spoke with someone he was with and stated that they would cover the price of the acid and would have it available by approximately December 15, 2018. GILBERT confirmed that he and his roommate were still living at the same residence in South Lake Tahoe, California but would be willing to meet me in Placerville, California to deliver the LSD if necessary.

57. TFO Dave Stevenson traveled to 2366 Tahoe Vista Drive, South lake Tahoe, California on December 5, 2018 and again observed the same red Ford Trucks associated with GILBERT and MOBLEY parked in the driveway of the residence.

### Training and Experience Regarding Drug Trafficking and Drug Traffickers

58. As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in

14

memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

59. Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically traffickers keep records of those registrations and transactions in their residence.

60. I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

61. In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

62. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, LSD, MDMA, cocaine, and marijuana, which they intend to distribute. It is my experience that these drug traffickers commonly use these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

63. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such

traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

64. In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

65. In my experience, drug traffickers often use vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also use vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often use vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

66. In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

67. In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

68. Individuals involved in the distribution of LSD, MDMA, cocaine, and marijuana often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their methamphetamine distribution, use, possession, or any other activities surrounding their cocaine trafficking activities, and that such items often identify co-conspirators in their cocaine trafficking activities.

69. It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the cocaine deals, records relating to these activities will be found stored in the cellular telephone. The drug traffickers in this case (MOBLEY and GILBERT) have made extensive use of text messaging to communicate about their ongoing drug trafficking. I noted that there were numerous apparent "Short Message System," or "SMS," 0 second calls recorded per telephone records between MOBLEY and GILBERT, indicative of text message communication. I too have engaged in narcotics-related text messages with GILBERT.

70. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory

a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

71. As described above and in **Attachment A**, this Affidavit seeks permission to search and seize things that are related to the LSD, MDMA, cocaine, and marijuana conspiracy between MOBLEY and GILBERT, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

72. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in **Attachment B** are items most often associated with the distribution of controlled substances, including LSD, MDMA, cocaine, and marijuana, as well as the proceeds from such illegal operations.

73. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

74. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B**. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in **Attachment B** to this Affidavit and incorporated here by reference.

## Request to Seal

75. I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, search warrant, arrest warrants, complaint, and affidavit. I believe that sealing these documents is necessary because the persons to be arrested and the items and information to be seized are relevant to an ongoing investigation into criminal activities by MOBLEY, GOLBERT, and their coconspirators. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants over the internet, and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, as well as endanger the safety of agents serving the warrant requested.

## Conclusion

76. In this case, the facts set forth in this Affidavit demonstrate probable cause to believe that the locations listed in **Attachment A** to this Affidavit contains evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, **Amerika MOBLEY** and **Benjamin GILBERT** and their ongoing collective effort to distribute and possess with intent to distribute LSD, MDMA, cocaine, and marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1).

77. Specifically, I respectfully request authority to search:

A. The current residence of GILBERT and MOBLEY located at **2366 Tahoe Vista Drive, South Lake Tahoe, California;**

B. The person of **Benjamin GILBERT**

C. The person of **Amerika MOBLEY**;

D. All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership

or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person;

78. I further request that based upon this Affidavit, a Criminal Complaint and Arrest Warrants be issued for **Amerika MOBLEY** and **Benjamin GILBERT** charging them with  distribution and conspiracy to distribute and possess with intent to distribute at least 10 grams of a mixture and substance containing a detectable amount of LSD and a mixture and substance containing a detectable amount of MDMA, in violation of 21 U.S.C. § 846 and 841(a)(1).


I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

Brian Nehring, Special Agent
Drug Enforcement Administration


Sworn to and subscribed before
me on the _14_ day of December 2018


ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE



Approved as to form:

Cameron L. Desmond
Assistant U.S. Attorney

## Attachment A

### Locations to be Searched

A. The property located at 2366 Tahoe Vista Drive, South Lake Tahoe, California, described as a one-story single family residence; light in color; with the numerals 2366 affixed to the front of the residence above garage door, including all outbuildings, sheds, storage facilities, and trailers on the property. Below are photographs of the property to be searched:





B.  The person of **Benjamin GILBERT**;

C.  The person of **Amerika MOBLEY**; and

D.  All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.

## Attachment B
## Items to be Seized

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by MOBLEY and GILBERT and their co-conspirators:

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute LSD, MDMA, Cocaine and Marijuana.

- Title 21 U.S.C. Section 841(a)(1) – Distribution and Possession with Intent to Distribute LSD, MDMA, Cocaine and Marijuana.

- Title 21 U.S.C. Section 843 – Use of a Communication Facility to Facilitate a Drug Trafficking Crime, specifically, Distribution of LSD, MDMA, Cocaine, and Marijuana.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1.  Controlled substances, including LSD, MDMA, Cocaine and Marijuana, or items frequently used to distribute LSD, MDMA, Cocaine and Marijuana, or items containing residue from the distribution of LSD, MDMA, Cocaine and Marijuana; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including glass vials (including dropper vials), alcohol and solvents, plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2.  United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase LSD, MDMA, Cocaine and Marijuana, from MOBLEY and GILBERT during in this investigation;

3.  Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5.      Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.      Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.      Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.      Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.     Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person, including MOBLEY and GILBERT;

11.     Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and